**UAW LOCAL 540, et al., Plaintiffs,**

v.

**Lloyd J. BARETZ, et al., Defendants.**

No. 97–76334, 97–76335.

United States District Court,
E.D. Michigan,
Southern Division.

March 20, 2001.

Michael F. Saggau, UAW International Union Legal Department, Detroit, MI, for United Auto, Aerospace and Agricultural Implement Workers of America, Local 540.

Linda O. Goldberg, Miller, Canfield, Ann Arbor, MI, for Owens Brockway Glass Container, Inc.

Daniel G. Wyllie, Timothy K. Carroll, Dykema Gossett, Detroit, MI, Robert J. Trizna, Schuyler, Roche, Chicago, IL, for Lloyd J. Baretz, Beaver Precision Products, Inc., BVR Liquidating, Inc.

Steven A. Roach, Miller, Canfield, Detroit, MI, for Beaver Aerospace and Defense, Inc.

Daniel G. Wyllie, Dykema Gossett, Detroit, MI, Robert J. Trizna, Francis M. Pawlak, Schuyler, Roche, Chicago, IL, for Unitron, Inc.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM FOR LONG TERM DISABILITY BENEFITS

EDMUNDS, District Judge.

This matter came before the Court on Plaintiffs' Motion for Summary Judgment on Claim for Long Term Disability Benefits.

Plaintiffs seek reinstatement of disability income, health, life, and dental benefits for four disabled plaintiffs pursuant to a collective bargaining agreement between Defendant Unitron ("Unitron") and the union. Plaintiffs additionally ask the Court to order Unitron to pay a lump sum equal to the disability income benefits owed to the disabled plaintiffs and to reimburse them for the out-of-pocket health and dental expenses that they incurred as a result of Unitron's termination of their disability benefits. Finally, Plaintiffs seek prejudgment interest on all payments owed to the disabled plaintiffs.

### I. Facts and Argument

Plaintiffs filed suit against Defendants BVR Liquidating, Inc. ("BVR"), Lloyd Baretz and Unitron alleging Defendants' breach of several collective bargaining agreements ("CBAs") in violation of § 301 of the National Labor Relations Management Act ("LRMA"), 29 U.S.C. § 185; 29 U.S.C.A. § 1132 et. seq.[1] The suit arose out of Defendants' closure of its Troy, Michigan production plant on April 7, 1997. When the plant was shut down, Defendants stopped providing benefits to Plaintiffs pursuant to the CBAs.[2]

The disabled plaintiffs are Thomas Menter, Donna Silkowski, Jimmy Rowe, and Steve Marinkovich, who were active employees of Unitron when they became disabled. Thomas Menter ("Menter") suffered a stroke on August 1, 1993, and he began receiving disability benefits that year. See Reply Ex. C. Menter worked for Unitron for approximately twenty-seven years before he became disabled. See id. Donna Silkowski ("Silkowski") was diagnosed with a multiple myeloma in May 1993, and she began receiving disability benefits that year. See Reply Ex. D. Silkowski worked for Unitron for fifteen years before she became disabled. Id. Jimmy Rowe ("Rowe") suffered a stroke on August 24, 1992, and he began receiving disability benefits that year. See Reply Ex. B. Rowe worked for Unitron for fifteen years before he became disabled. See id. Steven Marinkovich ("Marinkovich") was diagnosed with emphysema and a heart condition in 1992 and he began receiving disability benefits that year. See Reply Ex. A. Marinkovich worked for Unitron for fourteen years before he became disabled. See id. Defendants terminated the disabled plaintiffs' disability benefits in June 1997, after the Troy, Michigan plant was closed. See Reply Ex. A–D. Each

---

1. Defendant Unitron operated the business until May 31, 1994, when it sold the business to Beaver Precision Products ("BPP"). On April 7, 1997, BPP sold essentially all its assets and changed its name to BVR Liquidating, Inc. Lloyd Baretz was the president, director, and controlling majority shareholder of BPP.

2. Three different CBAs are at issue in this lawsuit: (1) a 1988–91 agreement; (2) a 1991–1994 agreement; and, (3) a 1994–1997 agreement. Each CBA incorporates an insurance agreement that summarizes employee and retiree benefits. The 1991–1994 Insurance Agreement is relevant to the pending motion.

individual, however, continues to receive Social Security disability benefits.[3]

The disabled plaintiffs' disability benefits are set forth in the 1991–1994 Collective Bargaining Agreement and the incorporated 1991–1994 Insurance Agreement ("the Agreement"), as they were active employees who became disabled while these agreements were in effect. The introduction to Section 5 of the Agreement provides that "[t]he Benefits described in this Section 5 will be provided to eligible Employees who are covered for the respective benefits on the date of death or disability." *See* Motion Ex. A at 4. Section 5D(1)(c) of the Agreement provides:

> Effective July 1, 1988, an active Employee ... who becomes wholly and continuously disabled as a result of an illness or an accident (including industrial disabilities which occur while at work for the Company) will be entitled to Disability Benefits provided he is under the care of a licensed physician and makes timely application for such benefits.

*See* Motion Ex. A at 8. The Plan deems an employee to be "wholly and continuously disabled" after the first twelve months of receiving benefits if the employee "is wholly prevented by his disability from engaging in any regular employment at the Plant or Plants where he has seniority and is not engaged in regular employment or occupation for remuneration or profit." *See id.* An employee is entitled to continued death, health care, and dental benefits at company expense while the employee is receiving disability benefits, provided the employee retains seniority. *See* Motion Ex. A at 18–19.

Section 5D(1)(d) of the Agreement indicates that an employee normally will not be disqualified from receiving company disability benefits because he or she re-

ceives disability benefits from other sources, such as Social Security. *See id.* However, the Agreement provides that company disability benefits will be reduced if the amount of those benefits, together with benefits from other specified sources, exceed 70% of the employee's average weekly earnings. *See id.* at 9. According to the Agreement, the company uses the amount of any Social Security disability benefits initially received by the employee to calculate the amount of any reduction in the employee's company disability benefits. *See* Motion Ex. A at 9.

The duration of disability benefits is set forth in Section 5D(4) of the Agreement. That section provides:

> Benefits will be payable weekly for a period equal to that Employee's seniority as of the date of disability except that benefits paid during a prior period of disability in excess of 52 weeks will reduce the maximum benefit period available thereafter. Such limit will not apply to Employees who are totally and permanently disabled if they have 10 or more years of pension credited service as of the date immediately following the crediting of pension service for a maximum of five years while on sick leave of absence. Benefits will cease at the Employee's normal or actual retirement date, whichever occurs first, provided however that if the Employee becomes disabled after age 60, benefits will be payable for a maximum of five years or until retirement, whichever occurs first
> . . .

*See* Motion Ex. A at 11–12. Although the Agreement does not define "normal retirement date," Plaintiffs provide the union and company's Pension Agreement and Pension Plan that became effective July 1,

---

3. The Social Security Administration determined that each disabled plaintiff was totally and permanently disabled prior to awarding the individual Social Security disability benefits. *See* Reply Ex. A–D.

1994, which states that "[a]n Employee shall reach his Normal Retirement Date on the first day of the month coincident with or next following his sixty-fifth (65th) birthday." *See* Motion Ex. B.

Plaintiffs contend that the plain language of the Agreement indicates that the disabled plaintiffs are entitled to continued disability benefits until they actually retire or reach age 65. As the disabled plaintiffs had not retired and were under age 65 when Unitron terminated their disability benefits,[4] they claim that the company breached the Agreement. Defendants argue that the disabled plaintiffs have failed to present sufficient evidence to establish their entitlement to disability benefits under the Agreement.

## II. Standards for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden

of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Analysis

### A. Unitron's Obligation to Provide Disability Benefits

■ Defendants argue that Plaintiffs must present sufficient evidence to establish that the disabled plaintiffs remain eligible for disability benefits under the Agreement. This is not Plaintiffs' burden.[5] Unitron apparently determined that

---

4. When Unitron terminated their benefits in June 1997, the disabled plaintiffs were 57 years of age or younger. Marinkovich, born August 12, 1939, was 57 years old; Rowe, born October 17, 1944, was 52 years old; Menter, born August 5, 1939, was 57 years old; and, Silkowski, born May 10, 1945, was 52 years old. *See* Reply Ex. A–D.

5. There is nothing in the Agreement requiring disabled employees to provide proof of their

continued eligibility for disability benefits after they initially are deemed eligible. The only event that would appear to shorten an employee's receipt of disability benefits appears to be his or her doctor's release to return to work or a company physician's release, when supported by the opinion of a mutually selected physician. *See* Motion Ex. A at 8.

the disabled plaintiffs were eligible for disability benefits when the company began providing them with those benefits. The issue is whether the disabled plaintiffs' interests in the disability benefits survived the termination of the Agreement and, if so, whether Unitron reserved the right to unilaterally terminate those benefits.

■■■ Whether benefits survive the termination of a CBA depends on the intent of the parties. *See UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983). To discern the intent of the parties, the *Yard–Man* Court advised that a court should apply the basic rules of contract interpretation:

> The court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent ... The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.

*Id.* at 1479–1480 (citations omitted). In addition, a court must construe the terms of a CBA "so as to render none nugatory and avoid illusory promises." *Id.* Finally, a court should look to extrinsic evidence to determine the parties' intent only when the terms of the contract are ambiguous. *See UAW v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir.1999)*(citing Yard–Man,* 716 F.2d at 1480).[6]

■■■ Section 1A of the Agreement provides that the benefits set forth therein "will be provided at no cost to the Employees or retirees for the term of this Agreement except where the Plan specifically provides otherwise." *See* Motion Ex. A at 1. Section 5(D)(4) provides that an employee is entitled to disability benefits until the employee's "normal or actual retirement date, whichever occurs first ..." *See id.* at 11–12. Disability benefits therefore are among those benefits excepted from the four-year duration set forth in Section 1A. In fact, Defendants continued to pay disability income and provide disability benefits to the disabled plaintiffs several years after the 1991–1994 Agreement terminated. Once the disabled plaintiffs were entitled to continued disability benefits, Unitron unilaterally could not modify or terminate those benefits unless its power to do so is an explicit part of the Agreement. *See Helwig v. Kelsey–Hayes Co.,* 93 F.3d 243, 250 (6th Cir.1996) (citations omitted).

Neither the 1991–1994 CBA nor the Agreement contain a provision reserving to Unitron the right to unilaterally modify or terminate disabled employees' vested benefits. Therefore, as the express language of the Agreement provides that disability benefits shall continue until the employee's actual retirement date or when the employee turns 65 years of age, and since none of the disabled plaintiffs have retired or reached age 65, Unitron breached the Agreement when it terminated those benefits in 1997. Unitron is ordered to reinstate the disabled plaintiffs' benefits.

**B. Defendants' Obligation to Reimburse Plaintiffs' for Out–of–Pocket Expenses Incurred as a Result of its Breach of the Agreement**

■■■ In cases alleging violations of the LRMA, courts have held that the purpose of any award "is to make employees whole for the losses suffered." *See Aguinaga v. United Food and Commercial Workers*

---

**6.** In *BVR Liquidating, Inc.,* the Sixth Circuit affirmed Judge Hackett's judgment in this case holding that Plaintiffs had a lifetime vested interest in health care benefits under the CBAs and that Defendants breached the CBAs by terminating those benefits.

*Int'l. Union,* 720 F.Supp. 862, 870 (D.Kan. 1989), *aff'd in part, rev'd on other grounds,* 993 F.2d 1463 (10th Cir.1993)*(citing, Bowen v. United States Postal Service,* 459 U.S. 212, 223, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983)); *see also Westinghouse Elec. Corp. v. Int'l Bhd. of Elec. Workers,* 561 F.2d 521, 523 (4th Cir.1977)(holding that compensatory damages may be awarded when a breach of a bargaining agreement causes monetary loss). A court finding that an employer breached its collective bargaining agreement with its employees should attempt to fashion a remedy that will place the employees in the position they would have attained had the agreement been performed. *See Int'l Bhd. of Elec. Workers v. A–1 Elec. Service, Inc.,* 535 F.2d 1, 3 (10th Cir.1976). As the Tenth Circuit Court stated, "the general rule in breach of contract cases is that the defendant is liable for all damages resulting from the breach that could have been reasonably and fairly contemplated by the parties at the time of execution." *Id.* at 4 (citations omitted). Thus courts have awarded plaintiffs compensation for the loss of their medical benefits if they purchased substitute insurance coverage or incurred out-of-pocket expenses which would have been reimbursed under the collective bargaining agreement. *See, e.g., Aguinaga,* 720 F.Supp. at 875.

■■ Compensatory or punitive damages are not available under § 1132(a)(3) of ERISA. *See Helwig v. Kelsey–Hayes Company,* 907 F.Supp. 253, 256 (E.D.Mich. 1995) (citations omitted). Thus in *Helwig,* where retirees sued their former employer alleging violations of ERISA based on a series of reductions in their health insurance coverage, the Sixth Circuit Court of Appeals granted the employer's motion to strike the retirees' request for "damages in the amount of all sums paid by plaintiffs to maintain [health insurance] coverage plus an amount to compensate plaintiffs for pain, suffering and emotion distress."

*Id.* While legal relief is not available under § 1132(a)(3), an award of traditional equitable relief, including restitution, is appropriate. *See 29 U.S.C.A. § 1132(a)(3); Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 661 (6th Cir.1996); *see also Howe v. Varity Corp.,* 36 F.3d 746, 755 (8th Cir.1994)(granting award in the nature of restitution to compensate retirees for welfare benefits they were owed under an employee welfare benefits plan), *aff'd* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In *Golden,* retirees sued their former employer under ERISA when the employer modified their health care benefits. The Sixth Circuit classified as equitable relief the retirees' request for an award of out-of-pocket expenses incurred in increased deductibles and co-payments as a result of the employer's modification of their health benefits. *See Golden* 73 F.3d at 661. As the *Golden* Court stated, "[i]t is well-settled that equitable relief includes monetary damages where required to afford complete relief." *Id.*

■ Unitron violated the LRMA and ERISA when it breached the CBA and terminated Plaintiffs' disability benefits. Under the LRMA, the disabled plaintiffs are entitled to an award that will compensate them for the out-of-pocket medical expenses that they incurred as a result of losing their medical and dental benefits. Under ERISA, this award constitutes restitution for the benefits the disabled plaintiffs were entitled to receive under the Agreement but of which they were deprived.

## C. Prejudgment Interest on Delinquent Disability Benefits

■ Prejudgment interest may be awarded in the Court's discretion. *Tiemeyer v. Cmty. Mutual Ins. Co.,* 8 F.3d 1094, 1102 (6th Cir.1993)*(citing Bricklayers' Pension Trust Fund v. Taiariol,* 671

F.2d 988, 990 (6th Cir.1982)). Such awards are deemed to be compensatory, not punitive, and thus the Court need not find wrongdoing by Unitron prior to awarding Plaintiffs prejudgment interest. *Id. (citing Drennan v. General Motors Corp.,* 977 F.2d 246, 253 (6th Cir.1992)). The Sixth Circuit generally awards beneficiaries prejudgment interest on benefits wrongfully withheld because " '[a]ny additional time one gains, rightfully or wrongfully, in not having to submit payment of a sum of money owed another is without a doubt a benefit' " and the beneficiary " ' . . . has been deprived of the benefit of those payments.' " *Tiemeyer,* 8 F.3d at 1102 *(quoting Sweet v. Consol. Aluminum Corp.,* 913 F.2d 268, 270 (6th Cir.1990)). The Court of Appeals explains that allowing a defendant " . . . to retain the interest it earned on funds wrongfully withheld from a beneficiary would be to approve of an unjust enrichment." *Id.* And, the Court reasoned, without an award of prejudgment interest "the relief granted would fall short of making the beneficiary whole because he has been denied the use of money which was his." *Id.; see also Detroit Diesel Corp. v. Lane–Smith,* 39 F.Supp.2d 852, 863–64 (E.D.Mich.1999). The Court warns that "[r]elieving defendants from the payment of prejudgment interest would create an incentive for insurers to delay payment and would undercompensate victims by forcing them to absorb expenses incurred as a result of the delay." *Tiemeyer,* 8 F.3d at 1094 *(citing Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692, 697 (7th Cir.1991)(holding that the ability of defendants to earn interest on funds which should have been expended to pay plaintiffs' medical benefits would result in the defendants' unjust enrichment)).

■ Defendants argue that an award of prejudgment interest is premature because Plaintiffs have failed to establish that the disabled plaintiffs met and continue to meet the eligibility requirements for disability benefits under the Agreement. Plaintiffs established their eligibility for those benefits however and they were entitled to receive disability benefits until their actual retirement or until they reach age 65. Unitron has benefitted by not providing disability benefits to the disabled plaintiffs for almost four years. And the disabled plaintiffs have been forced to incur substantial expenses as a result of Unitron's breach. Therefore this is exactly the scenario where an award of prejudgment interest is appropriate.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Plaintiffs' Motion for Summary Judgment on Claim for Long Term Disability Benefits is GRANTED.